WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

National Fire Insurance Company of Hartford, et al.,

Plaintiffs,

v.

James River Insurance, et al.,

Defendants.

No. CV-14-00765-PHX-JAT

**ORDER**

The instant matter arises of out Defendant James River Insurance ("James River")'s refusal to defend and indemnify Sigma Contracting, Inc. ("Sigma") in litigation over property damage caused by a plumbing subcontractor's work during construction of a shopping center. Both James River and Plaintiffs National Fire Insurance Company of Hartford ("National Fire")[1] and Sigma have filed cross-motions for summary judgment and ask the Court to interpret an insurance policy. Having reviewed the record and considered oral argument, the Court now rules on the pending motions.

## I.      Background

The dispute between the parties traces its roots to the installation of plumbing pipes and fixtures by Quik Flush Plumbing ("Quik Flush"), a subcontractor, during the

---

[1] National Fire is an Illinois insurance corporation licensed to do business in the State of Arizona. (Doc. 10 at 1). National Fire issued a "commercial package insurance policy" to Sigma from December 31, 2007, to December 31, 2009. (*Id.* at 2). National Fire provided defense and indemnity to Sigma, the General Contractor for a construction project in Mesa, Arizona.

construction of The Shoppes at Legacy House (the "shopping center") in Mesa, Arizona from 2006—2007. (Doc. 39 at 1-2). For the most part, the facts are not in dispute. (Doc. 47 at 1). In July 2006, Alta Mesa & McKellips, LLC ("Alta Mesa") entered into a General Contract with Sigma to construct the shopping center. (Doc. 39 at 1). On August 20, 2006, Sigma entered into a Subcontract Agreement with Quik Flush to complete all plumbing work for the construction project. (Doc. 41 at 2). Quik Flush then purchased a Commercial General Liability ("CGL") insurance policy (the "Policy") from James River. (Doc. 39 at 2). The Policy provided coverage from February 11, 2007, to February 11, 2008.[2] The record is unclear as to when Quik Flush began work, but it completed installation of the plumbing in the shopping center without incident by May 30, 2007. (Doc. 43 at 5).

Despite the incident-free plumbing installation, an issue arose with respect to Quik Flush's work soon after a number of tenants had signed leases with Alta Mesa and began business operations. Specifically, four tenants (collectively the "*Knuth* tenants")[3] who opened businesses in the shopping center suffered injury from a plumbing defect in the shopping center between October 2007, and November 2008.[4] Almost immediately after

---

[2] It is undisputed that James River only covered Quik Flush during this one-year period. (Doc. 39 at 2; Doc. 43 at 1-2).

[3] The Court refers to the four tenants who filed suit in Maricopa County against Alta Mesa as the "*Knuth* tenants" for clarity and consistency. Dr. Lynn Knuth was the named plaintiff in the suit, and both parties utilize the term "Knuth tenants" throughout their briefs.

[4] EJ Holding Company, Inc., dba EJ's Steakhouse ("EJ's") was one of the first tenants to sign a lease and occupy the completed shopping center. (Doc. 39-3 at 7, 9). EJ's began operations "in early October, 2007." (*Id.* at 9). Frader Endeavors, LLC, dba Kaizen Martial Arts Academy ("Kaizen") began operations in July 2008. (Doc. 39 at 3). Dr. Lynn Knuth, dba Red Mountain Family Chiropractic ("Red Mountain"), signed a lease with Alta Mesa in March 2008, and opened her business on September 22, 2008. (*Id.*). Treible & Parks, LLC, dba Pizza Fusion ("Pizza Fusion"), "began the build-out of its suite in August of 2008," and ultimately opened its restaurant on November 22, 2008. (*Id.*).

- 2 -

the *Knuth* tenants opened their respective businesses, each tenant encountered a terrible "sewer odor" that was described as "sickening . . . horrific . . . revolting . . . and []debilitating." (Doc. 41 at 4). The noxious gas, later determined to be Hydrogen Sulfide,[5] was omnipresent; it was "continual," "overwhelming," "unabated," and prevented customers from patronizing the affected businesses. (Doc. 39-3 at 7-8). Although the *Knuth* "[t]enants attempted to, and did, conduct business," the "ultimate result [was] that the [t]enants were forced to shut down," and suffered caused "catastrophic damages." (*Id.* at 8).

On October 2, 2009, the *Knuth* tenants filed suit against Alta Mesa in Maricopa County Superior Court. The complaint alleged that due to "the sickening sewer gaseous odor radiating from" the shopping center, the businesses incurred damages in the form of potential liability under their leases, "loss of revenues, damage to good will, operating losses and future lost profits."[6] (Doc. 10-4 at 10). *See Knuth*, *et al v. Alta Mesa & McKellips*, *LLC*, *et al.*, No. CV-09-031043 (Ariz. Super. Ct. Oct. 2, 2009). No personal injury or property damage was alleged. Rather, "the continual overwhelming and unabated presence of the noxious sewer gas" interfered with business operations and prevented use of tangible property. (Doc. 39 at 2-3). On September 21, 2012, the *Knuth* tenants settled for $242,500, which was paid by National Fire. (Doc. 39 at 8; Doc. 43 at 9).

---

[5] James River does not contest Plaintiffs' factual assertion that the sewer gas causing the foul odor was Hydrogen Sulfide.

[6] On August 3, 2012, the Superior Court in *Knuth* granted the defendants' motion for summary judgment against plaintiff EJ's "based on a waiver of claims and damages that arose prior to February 17, 2009, pursuant to a rent concession agreement." (Doc. 39-4 at 17). The plaintiffs thereafter requested clarification from the court with respect to its order granting summary judgment. (*Id.* at 25). In its subsequent clarification order, the court "reaffirm[ed] that the . . . August 3, 2012[,] Order granted Defendants' Motion for Summary Judgment in its entirety (including Defendants' argument that EJ's . . . damages occurred prior to February 19, 2009)." (*Id.*). James River argues that the court's order granting summary judgment disposed of the entirety of EJ's claims. (Doc. 39 at 8).

On January 5, 2011, Alta Mesa filed a Third-Party Complaint against Sigma, alleging that as the General Contractor for the construction project, Sigma had a duty to defend and indemnify Alta Mesa for any liability arising out of the *Knuth* tenants' lawsuit. (Doc. 39 at 5). In turn, Sigma filed a Fourth-Party Complaint against Quik Flush on June 22, 2011. (*Id.* at 6). Sigma sought "express and implied indemnity from Quik Flush for any liability Sigma Contracting had to [Alta Mesa] arising out of the [tenant] plaintiffs' claims." (*Id.*). Quik Flush—evidently out of business by this time—failed to respond, (*Id.*), and on May 9, 2013, the Superior Court entered a default judgment against Quik Flush and awarded $510,642.17[7] to Sigma. (Doc. 10-4 at 62-63).

On June 8, 2011, Sigma "tendered the Third-Party Complaint against Sigma to James River Insurance for defense and indemnity," pursuant to Sigma's designation as an additional insured under the Policy. (Doc. 39 at 6). The initial tender included a short letter, a copy of the *Knuth* tenants' complaint, and the Third-Party Complaint filed against Sigma. (Doc. 39-3 at 17-18).   On August 11, 2011, after an investigation of Sigma's claim, James River concluded that "there is no coverage afforded to Quik Flush for this claim" and thus "there can be no additional insured coverage afforded to Sigma." (*Id.* at 20). James River based its conclusion on the Policy's "absolute exclusion for any claim arising from gas pollution such as what [was] alleged in this matter." (*Id.* at 21). This exclusion "clearly preclude[d] coverage for damages for bodily injury, property damage, or any other type of injury, resulting from the actual or alleged 'discharge, dispersal, seepage, migration, release, escape or placement' of pollutants." (*Id.*). James River also asserted that the Policy only provided coverage when "property damage occurs during the Policy period," and "[f]rom the documents reviewed, it [was] unclear when Quik Flush completed its work or when the alleged damage occurred." (*Id.* (internal quotation marks omitted)).   Because "there was no 'occurrence' during the relevant Policy period, there would be no coverage for this claim." (*Id.*).

---

[7] The court awarded $242,500 for breach of contract, $240,428 in attorneys' fees, and $27,714.17 in interest. (Doc. 43 at 9).

On May 1, 2012, Sigma renewed its tender to James River to "agree to defend and indemnify [Sigma] with respect to the *Knuth* litigation," due to additional developments in the underlying litigation. (Doc. 39-3 at 25-26). Sigma asserted that the *Knuth* tenants had obtained an expert who tested the drain line that Quik Flush installed in the shopping center. (*Id*. at 25). The expert concluded that Quik Flush's installation was faulty and caused a "dip" in the drain line that "may have caused the pipe to pull apart or crack," which resulted in sewage being released. (*Id*. at 26). Unmoved by Sigma's "additional factual allegations," James River again concluded that "there [was] no coverage under the Policy for this claim." (Doc. 39-4 at 2). James River's second denial was more robust, but rested on the same findings: (1) there was no occurrence during the Policy's coverage period; and (2) the absolute pollution exclusion precluded coverage for property damage caused by the release of Hydrogen Sulfide gas from drain pipes installed by Quik Flush. (Doc. 39-4 at 3-15).

Twice rebuffed by James River in their request for defense and indemnity, Plaintiffs filed suit in this Court on April 11, 2014. Plaintiffs seek declaratory relief and subrogation, or, in the alternative, equitable contribution from James River in the amount of $510,642.17. (Doc. 10 at 8). On July 30, 2015, James River filed a motion for summary judgment, (Doc. 38), and Plaintiffs filed a cross-motion for summary judgment on August 28, 2015. Oral argument on the motions was held on February 3, 2016.

Having set forth the pertinent factual and procedural background, the Court now turns to the parties' motions.

## II.     Standard of Review

### a.     Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Assurance Co. of Am. v. Wall & Assocs. LLC of Olympia*, 379 F.3d 557 (9th Cir.

2004) (citation omitted); *see also* Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating to the Court the basis for and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-movant to establish the existence of a material fact in dispute. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. But in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### b.     Insurance Policy Interpretation

Likewise, the tenets of insurance policy contractual interpretation are well-established. "The interpretation of an insurance contract is a question of law" for the Court. *Liristis v. Am. Family Mut. Ins. Co.*, 61 P.3d 22, 26 (Ariz. Ct. App. 2002) (citation omitted). An insurance policy "must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau v. Blue Cross*, 634 P.2d 972, 975 (Ariz. Ct. App. 1981) (citation omitted). The Court must "construe the written terms of [the policy] to effectuate the parties' intent," and "to protect the reasonable expectations of the insured," *Liberty Ins. Underwriters*, *Inc. v. Weitz Co.*, 158 P.3d 209, 212 (Ariz. Ct. App. 2007) (citations omitted)), and the Policy's language "must be viewed from the standpoint of the average layman who is untrained in the law or the field

of insurance." *Liristis*, 61 P.3d at 25-26 (citation omitted). Where the language of the policy is clear, the Court shall "afford it its plain and ordinary meaning and apply it as written." *Liberty Ins. Underwriters*, *Inc*., 158 P.3d at 212 (citation omitted). If the policy's language is ambiguous, "Arizona courts no longer resolve ambiguities in an insurance policy by automatically construing the policy in favor of the insured." *Nichols v. State Farm Fire & Casualty Co*., 857 P.2d 406, 408 (Ariz. Ct. App. 1993). Rather, "the rule in Arizona is that [courts] construe a clause subject to different interpretations by examining the language of the clause, public policy considerations, and the purpose of the transaction as a whole." *Id.* (citation omitted).

### III.    Analysis

The dispute between the parties, concisely, is whether James River had a duty to defend and indemnify Sigma in the Third-Party Complaint filed against Sigma by Alta Mesa. The cross-motions for summary judgment encompass four[8] distinct issues: (1) whether an "occurrence" during the Policy's coverage period triggered James River's duty to defend Sigma as an additional insured;[9] (2) whether the Policy's absolute

---

[8] In James River's initial denial letter, it asserted that "several other Policy exclusions may also apply. For example, with certain exceptions pertaining to contractual liability and to property damage included in the Policy's 'products-completed operation hazard,' the [P]olicy generally excludes coverage for construction defects." (Doc. 39-3 at 21). James River did not actually assert any additional contractual provisions as a basis for refusing to defend and indemnify Sigma and has not raised the issues here. Thus, the Court will not address it further.

[9] It is not entirely clear whether James River intended to argue that Sigma is not entitled to defense or indemnity because no "occurrence" became manifest during the Policy. The record establishes that James River denied coverage for Sigma, in part, on the basis that "there was no occurrence during the relevant policy period." (Doc. 39-3 at 21). In James River's motion for summary judgment—filed first—it neglects to raise this argument specifically. Rather, James River exclusively relies on the Absolute Pollution Exclusion as its basis for summary judgment. James River does, however, argue that if this Court finds that James River had a duty to defend Sigma, the Court should nonetheless conclude that Plaintiffs are not entitled to indemnity or subrogation because none of the surviving claims in the *Knuth* tenants' lawsuit occurred during the Policy's

1    pollution exclusion absolved James River of its duty to defend and indemnify Sigma; (3)

2    if James River's duty to indemnify is excused by the dismissal of plaintiff EJ's claims

3    from the underlying lawsuit; and (4) whether Sigma is entitled to equitable contribution.

4    Each will be addressed in turn.

5

6    **(A)    The Occurrence Provision**

7        The Court begins with James River's argument that it had no duty to defend and

8    indemnify Sigma because there was "no occurrence during the relevant policy period,"

9    (Doc. 39-3 at 21), "regardless of the Court's interpretation of the Absolute Pollution

10   Exclusion."[10] (Doc. 47 at 4).        Under the Policy, James River is bound to "pay those

11   sums that the insured becomes legally obligated to pay as damages because of 'bodily

12   injury' or 'property damage' to which this insurance applies." (Doc. 43-2 at 7). James

13   River also has "the right and duty to defend the insured against any 'suit' seeking those

14   damages." (*Id.*). The Policy is equally clear where it establishes that James River has "no

15   duty to defend the insured" when the Policy does not apply. (*Id.*). When the insured is

16   liable for "property damage," said damage must have been "cause[d] by an 'occurrence'

17   _____

18   coverage period. (Doc. 38 at 15-16). And in its response to Plaintiffs' motion for
     summary judgment, James River appears to argue that no duty to defend was triggered

19   because "none of the *Knuth* plaintiffs had a viable claim that would be covered under
     James River's policy regardless of the Court's interpretation of the Absolute Pollution

20   Exclusion." (Doc. 47 at 4). Although somewhat unclear, the Court finds that a reasonable
     reading of James River's briefs includes the argument that it had no duty to defend

21   existed because there was no "occurrence" during the Policy.

22

23   [10] The Court notes that James River's denial letter stated that "it is unclear when

24   Quik Flush completed its work on the project at issue and/or when the damages
     occurred," (Doc. 39-3 at 21), and that "[f]rom the documents reviewed, it is unclear when

25   Quik Flush completed its work or when the alleged damage occurred." (*Id.*). Plaintiffs
     argue that this language establishes that James River was uncertain as to whether liability

26   existed and therefore James River has conceded that it had a duty to defend Sigma. The
     Court acknowledges that James River's denial letter includes language that can be

27   characterized as uncertain. Nonetheless, given the unequivocal statement by James River
     that there was "no occurrence" and thus no duty to defend under the Policy, the Court

28   finds that James River did not concede this point.

that takes place in the 'coverage territory' and it must "occur[] during the policy period." (*Id.*). The Policy covered Quik Flush (and Sigma) from February 11, 2007, to February 11, 2008. It is undisputed that the *Knuth* tenants suffered "property damage"[11] and that the property damage was caused by "the presence of noxious gases in the shopping center environment." (Doc. 41 at 5-6). The parties further agree that the claim is governed by the Policy provision for the "[l]oss of use of tangible property that is not physically injured." (Doc. 43-2 at 21). When such a loss materializes, then "[a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (*Id.*).

The Court finds that the Policy terms at issue are plain and unambiguous. *Chandler Med. Bldg. Partners v. Chandler Dental Group.*, 855 P.2d 787, 791 (Ariz. Ct. App. 1993) (citation omitted). The fact that the term "accident," discussed below, is not defined by the Policy does not render the provision ambiguous. *Century Mut. Ins. Co. v. Southern Ariz. Aviation*, 446 P.2d 490, 492 (Ariz. Ct. App. 1968) (analyzing an insurance policy provision with nearly identical language). Nor does "the mere fact that [the] parties disagree as to [the] meaning" of the term "occurrence." *Chandler Med. Bldg. Partners*, 855 P.2d at 791 (citation omitted). A detailed discussion of the parties' respective arguments on this issue is not necessary. Straightforward application of the plain and unambiguous Policy terms and Arizona law is sufficient to resolve the dispute.

The term "occurrence" is the lynchpin triggering coverage. The Policy defines occurrence as "an accident." (Doc. 43-2 at 20). The term accident *includes* "continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*) Thus, the incident giving rise to the underlying lawsuit—consistent exposure to leaked Hydrogen Sulfide gas—is an explicitly delineated accident under the Policy.[12] Although the

---

[11] Property damage as defined by the Policy.

[12] Although not central to the analysis, the Arizona Court of Appeals has noted that "Arizona courts have not addressed the purpose of continuous exposure clauses, but other jurisdictions consistently have interpreted them to cover claims of incremental injury rather than instantaneous injury, particularly but not exclusively arising from exposure to environmental toxins." *Austin Mut. Ins. Co. v. Aldecoa*, 2011 Ariz. App.

Policy's definition for "occurrence" does not mandate that the "accident" occur during the Policy's coverage, a separate provision of the Policy requires that "property damage" be "caused by an 'occurrence'" "during the policy period." (Doc. 43-2 at 7). Read together, an "accident" must occur during the time the policy is in effect, s*ee University Mechanical Contractors v. Puritan Ins. Co.*, 723 P.2d 648, 651 (Ariz. 1986) (concluding that even though the insurance policy's definition of "occurrence" did not include a temporal limitation, other policy provisions operated to limit coverage to "the policy period"), and the Court relies on *Century Mut. Ins. Co.*, 446 P.2d at 492, and *Outdoor World v. Continental Cas. Co.*, 594 P.2d 546, 549 (Ariz. Ct. App. 1979).

Under Arizona law, "the general rule [is] that coverage is determined by the time of the injury or damage." *Associated Aviation Underwrites v. Wood*, 98 P.3d 572, 593 (Ariz. Ct. App. 2004) (quoting *Outdoor World*, 594 P.2d at 549). The Arizona Court of Appeals has stated that with respect to insurance policies that cover "accidents," and "giving to the word [accident] the meaning which a person of average understanding would," the term "clearly implies a misfortune with concomitant damage to a victim, and not the negligence which eventually results in that misfortune." *Id.* (quoting *Century Mut. Ins. Co.*, 446 P.2d at 492); *Austin Mut. Ins. Co.*, 2011 Ariz. App. Unpub. LEXIS 1265, at *6 n.2 (noting that when the policy language limits coverage to accidents during the policy period, accident is defined "as the event causing damage rather than an earlier event creating the potential for damage"); *see also State v. Glen Falls Ins. Co.*, 609 P.2d 598, 600 (Ariz. Ct. App. 1980) (acknowledging that the general rule "with respect to whether an 'occurrence' or 'accident' falls within the coverage of the policies is the time of the actual damage to the complaining party and not the time of the wrongful act"). The Arizona Supreme Court, in dicta, has cited to this "general rule" favorably. *See University Mechanical Contractors*, 723 P.2d at 650-51 (approving of the Court of Appeals' reliance on *Outdoor World* when the insurance policy restricted coverage to accidents that caused property damage when the insurance policy was in effect).

Unpub. LEXIS 1265, at *12 (Ariz. Ct. App. Oct. 11, 2011).

Moreover, "[t]his rule is followed in every jurisdiction that has considered the issue except Louisiana." *Millers Mut. Fire Ins. Co. v. Ed Bailey*, *Inc.*, 647 P.2d 1249, 1251 (Idaho 1982) (other citations omitted) (citing *Outdoor World*, 594 P.2d 546).

Arizona case law makes evident that an "occurrence" is the point at which damage materialized. Therefore, under the Policy, the coverage was not triggered by the faulty work that Quik Flush performed between August 26, 2007, and May 30, 2007, when installation caused the "dip in the pipe" that led to leaking Hydrogen Sulfide gas. Rather, the "occurrence" is the point at which the *Knuth* tenants were injured or damaged. The Policy states that with respect to property damage that results in "[l]oss of use of tangible property" without "physical[] injury," then "[a]ll such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it," (Doc. 43-2 at 21), i.e., the point at which injury or damage first occurred. Each of the tenants were damaged by the Hydrogen Sulfide gas almost immediately after taking possession of their leased property. (Doc. 41 at 4). Kaizen, Pizza Fusion, and Red Mountain all encountered the gas—whether during the "build out" of their property or when operations first commenced—after James River's coverage of Quik Flush expired. EJ's, however, began operations in "early October 2007," and "within the first week," "a bad sewer odor emanated from the building." (Doc. 39-3 at 9). Importantly, the record also establishes that Sigma presented James River with a "formal tender and request for defense and indemnity as an additional insured" under the Policy on June 8, 2011, when EJ's was still a party to the *Knuth* tenants' lawsuit. (*Id.* at 17).

Accordingly, the occurrence that triggered coverage was EJ's first encounter with Hydrogen Sulfide gas "in early October 2007," within the Policy's coverage period. Because EJ's claim occurred during the Policy's coverage period, James River's argument that it had no duty to defend or indemnify Sigma against all of the *Knuth* tenants' claims due to the lack of an "occurrence" must fail. It follows that James River's motion for summary judgment on the "occurrence" issue is denied. (Doc. 39-3 at 21).

**(B)     The Absolute Pollution Exclusion**

The Court next addresses James River's argument that even if there was an "occurrence" during the Policy, it was nonetheless relieved of its duty to defend and indemnify Sigma by operation of the Policy's "absolute pollution and pollution related liability" exclusionary clause.[13] (Doc. 38 at 7-15). Plaintiffs, in opposition, argue that under Arizona law, absolute pollution exclusionary clauses only apply to "traditional environmental pollution" and therefore the Hydrogen Sulfide gas that damaged the *Knuth* tenants does not fall within the clause.

The Court begins by setting forth the Policy's pollution exclusionary clause:

**ABSOLUTE POLLUTION AND POLLUTION
RELATED LIABILTY – EXCLUSION**

This endorsement modifies insurance provided under the following:

ALL COVERAGE PARTS

The following exclusion is added to this policy. If the policy already includes a pollution exclusion or a pollution-related exclusion, such exclusion(s) is(are) deleted and replaced with the following:

Pollution/environmental impairment/contamination is not covered under this policy, nor are any expenses nor any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising out of or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any insured or any other person or entity is excluded throughout this policy.

---

[13] The insurer bears the burden of establishing the applicability of an exclusionary clause. *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000) (citation omitted).

1

2
3
4

This insurance does not apply to any damages, claim, or suit arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' including but not limited to any:

5
6
7
8

a. 'Bodily injury', 'personal and advertising injury', 'property damage', or damages for the devaluation of the property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

9
10
11
12
13
14
15
16
17
18

b. Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of 'pollutants', environmental impairments, contaminants or (2) any litigation or administrative procedure in which any insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of 'pollutants', environmental impairments, or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

19
20

This exclusion applies regardless of whether:

21
22

a. Injury or damage claimed is included within the 'products-completed operations hazard' of the policy; or

23
24

b. An alleged cause for the injury or damage is the insured's negligent hiring, placement, training, supervision, retention, act, error or omission.

25
26
27

The following definition is added to the policy. If the policy already includes a definition of 'pollutants' such definition is deleted and replaced with the following:

28

'Pollutants' mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or

1
2
3
4

> contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or 'waste'. 'Waste' includes medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

5
6
7
8
9

(Doc. 39-4 at 34-35). The task before the Court is to determine whether the release of Hydrogen Sulfide gas caused by Quik Flush's work falls within the aforementioned clause, "a question of law." *Saba v. Occidental Fire & Cas. Co.*, 14-CV-00377-PHX-GMS, 2014 U.S. Dist. LEXIS 174169, at *4 (D. Ariz. Dec. 16, 2014) (citing *Benevides v. Arizona Prop. & Cas. Ins. Guar. Fund*, 911 P.2d 616, 619 (Ariz. Ct. App. 1995)).

10
11
12
13
14
15
16
17
18
19

James River argues that the damages suffered by the *Knuth* tenants was caused by Hydrogen Sulfide gas, which "was obviously 'fumes' in a 'gaseous' form that [was] acting as an 'irritant or contaminant' in a manner that interfered with the [*Knuth* tenants'] use of their leased property." (Doc. 38 at 10 ). Thus, the damages Plaintiffs seek indemnity for were excluded by operation of the plain and ordinary "definition of pollutants," and by extension, the Policy. (*Id.* (internal quotation marks omitted)). Moreover, and of "critical" importance, the Policy's "expanded" clause "expressly excludes coverage for any liability caused by any 'environmental impairment' in any form." (*Id.*). For these reasons, James River argues that it owed no duty to defend or indemnify Sigma, and National Fire is not entitled to subrogation.

20
21
22
23
24
25

Prior to analyzing the Policy's exclusionary clause, a brief primer on the pollution exclusionary clause in general is pertinent. Over many decades, the meaning, scope, and applicability of these clauses have "been litigated extensively," and the result has been fractured case law reflecting divided judicial views across numerous jurisdictions. *Mackinnon v. Truck Ins. Exchange*, 73 P.3d 1205, 1208 (Cal. 2003).[14]   However, two general interpretations have emerged: one "maintains that the exclusion applies only to

26
27
28

---

[14] The Court acknowledges that *McKinnon* is persuasive authority. Nonetheless, the *McKinnon* court did a very thorough job of surveying case law from numerous jurisdictions, probing the historical background of the pollution exclusionary clause, and tracking its evolution to offer a comprehensive examination of the issue.

traditional environmental pollution into the air, water, and soil, but generally not to all injuries involving the negligent use or handling of toxic substances that occur[] in the normal course of business"; *Id.* at 1208-09; the second "maintains that the clause applies equally to negligence involving toxic substances and traditional environmental pollution, and that the clause is as unambiguous in excluding the former as the latter." *Id.* at 1209 "[T]he narrower interpretation of the pollution exclusion appears to be [held] in the majority" of jurisdictions. *Id.* at 1209 n.2 (citations omitted). The Arizona Supreme Court has yet to definitively settle the issue, so the Court turns to the most recent pronouncement by the Arizona Court of Appeals in *Keggi*, 13 P.3d 785.

In *Keggi*, the court was presented with a pollution exclusionary clause that contained a definition for the term "pollutants" that is nearly identical to the Policy's definition.[15] 13 P.3d at 788-89. Faced with the issue of whether the absolute pollution exclusionary clause precluded coverage for the insured, the court first held that "total and fecal coliform bacteria" did not constitute a "pollutant" or "waste" under the plain and unambiguous language of the exclusionary clause. *Id.* at 789. The court then considered the insurance company's alternative argument, that the bacteria were a "contaminant" "— unmodified by the qualifiers "liquid solid, gaseous or thermal"—and therefore, "by definition, a pollutant." *Id.* To adjudicate this alternative argument, the court delved into a deeper analysis and considered "the purpose of the pollution exclusion" generally, noting that Arizona courts "ha[d] not previously considered the question." *Id.* After looking to "(1) the language and history of the pollution exclusion, (2) public policy, and (3) the transaction as a whole," *Saba*, 2014 U.S. Dist. LEXIS 174169, at \*6 (citation omitted), the Court of Appeals "narrowly interpreted," *id*. at \*5, the "standard 'absolute' pollution exclusion clause," and concluded that the "clause was intended to exclude coverage for causes of action arising from traditional environmental pollution," and "not

---

[15] The term "pollutants" was defined in the *Keggi* insurance policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." 13 P.3d at 789.

for 'all contact with substances that can be classified as pollutants.'" *Keggi*, 13 P.3d at 790 (quoting *Stoney Run Co. v. Prudential-LMI Commercial Ins. Co.*, 47 F.3d 34, 36 (2d Cir. 1995)).

James River argues that these holdings constitute a "carved out . . . narrow and carefully-limited exception to the plain language of the standard pollution exclusion," and that the decision is not an authoritative interpretation of pollution exclusionary clauses generally. (Doc. 38 at 13). The Court disagrees. The Arizona Court of Appeals considered—for the first time—"the purpose of the pollution exclusion" as a whole. *Keggi*, 13 P.3d at 789. Then, based on the language included in the "standard 'absolute' pollution exclusion . . . persuasive case law, and history," the court concluded that this clause—in its entirety—was "intended to exclude coverage for causes of action arising from traditional environmental pollution." *Id.* at 789-90, 91. Moreover, "public policy support[ed] an interpretation limiting the clause to its initial, intended purpose of excluding coverage for traditional environmental pollution-related claims." *Keggi*, 13 P.3d at 791. Nothing in this language suggests that *Keggi* stands for a "narrow and carefully-limited exception." It is a definitive interpretation of the scope and purpose of the standard absolute pollution exclusionary clause.

Turning to the Policy, the Court must first determine whether Hydrogen Sulfide gas is excluded by the "plain and ordinary meaning" of the clause's language. *Sparks v. Republic Nat'l. Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982) (citation omitted). The Policy's clause establishes, in part, that no coverage shall be provided by James River for any "property damage" that is the result of "discharge, dispersal, seepage, migration, release or escape of 'pollutants,' environmental impairments, or contaminants." (Doc. 39-4 at 34). The definition of "pollutants" includes any "gaseous . . . irritant or contaminant." (*Id.*). It is the plain meaning of these words—according to James River—that forecloses coverage for Sigma. Here, "there is less ambiguity in the [P]olicy language" than in *Keggi*, as Hydrogen Sulfide is a gas, and "is not generally considered benign." *Saba*, 2014 U.S. Dist. LEXIS 174169, at *9 (discussing carbon monoxide gas that caused

personal injury). Additionally, Hydrogen Sulfide gas, as a "fume[]," is an expressly delineated type of pollutant in the clause. (Doc. 39 at 35). But the Arizona Court of Appeals has noted that even where property damage is caused by a "'pollutant' within the express terms of the exclusion," the causal event must be "an event which would traditionally be considered 'environmental pollution.'" *Keggi*, 13 P.3d at 791 (distinguishing *City of Salina*, *Kansas v. Maryland Cas. Co*., 856 F. Supp. 1467 (D. Kan. 1994)). More is required for the clause to exclude Hydrogen Sulfide gas damage by "plain and ordinary meaning" of the clause's language.

The Court's finding is supported by the fact that even if an alleged pollutant is a "fume," it must also be an "irritant," a "contaminant," or an "impairment" within the meaning of the exclusionary clause. None of these terms are defined by the Policy, and courts have found that the "phrases 'irritant' and 'contaminant' are hopelessly imprecise."[16] *Id.* (citation omitted). The Arizona Court of Appeals has recognized that these terms "cannot be read literally as it would negate virtually all coverage." *Keggi*, 13 P.3d at 789 (quoting *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 948 (Ind. 1996)). Absent clear direction from the Policy, the Court finds that these terms must be read in light of the historical purpose of the pollution exclusionary clause—as interpreted by the Arizona Court of Appeals—to preclude coverage for "traditional environmental pollution." *Keggi*, 13 P.3d at 791. James River makes no effort to argue that Quik Flush's faulty plumbing installation, and the subsequent accumulation of gas, are "traditional environmental pollution." The Court has little trouble finding that faulty plumbing pipe

---

[16] While the Arizona Court of Appeals did not address the term "impairment" specifically, the Court has little difficulty in finding that the term is imprecise and "virtually boundless." Impairment is "[t]he quality, state, or condition of being damaged, weakened, or diminished." BLACK'S LAW DICTIONARY 869 (10th ed. 2014). When "viewed in isolation," there are countless substances, chemicals, or events that could damage, weaken, or diminish the environment in some way. The term "environmental impairment" must be tethered to some "limiting principle" otherwise the Policy's exclusionary clause would "extend far beyond its intended scope." *Keggi*, 13 P.3d at 791-92.

installation does not constitute "traditional" pollution, and the plain and ordinary language of the Policy does not excuse James River's duty to defend Sigma.

James River correctly notes, however, that the Policy does not contain the "standard absolute pollution exclusion" that was at issue in *Keggi*. Rather, it contains a more robust "absolute pollution and pollution related liability" exclusionary clause. James River must therefore establish that the clause in the Policy contains language that is "meaningfully distinct" from the standard exclusion in *Keggi*.[17] *Saba*, 2014 U.S. Dist. LEXIS 174169, at *7. The Court notes that—as in *Keggi*—the Policy's clause contains a number of phrases recognized as "terms of art in environmental law which generally are used with reference to damage or injury caused by improper disposal or containment of hazardous waste." *Keggi*, 13 P.3d at 789. For example, the Policy's clause precludes coverage for "any damages . . . arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." (Doc. 39-4 at 4 (internal quotation marks omitted)). "Many of these words are borrowed directly from environmental statutes." *Saba*, 2014 U.S. Dist. LEXIS 174169, at *7. Moreover, the clause includes provisions that "appear to be intended to preclude coverage for clean-up operations ordered under . . . federal or state environmental laws." *Keggi*, 13 P.3d at 791. The clause excludes coverage for "[a]ny loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of 'pollutants', environmental impairments, [and] contaminants." (Doc. 39-4 at 5). The Policy also excludes damages resulting from any litigation over "actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or

---

[17] When the plain and ordinary language of an insurance policy does not expressly preclude or establish coverage, the Court must examine the "the language [and history] of the clause, public policy considerations, and the purpose of the transaction as a whole." *Nichols*, 857 P.2d at 408 (citation omitted).

placement of 'pollutants,' environmental impairments, or contaminants." (*Id.*). All of this language is nearly identical to the "standard" absolute pollution exclusion.

But the Policy's exclusionary clause is different from the "standard" clause in two aspects: (1) it does not include language that addresses pollutants that are "transported, handled, stored, treated, disposed of, or processed as waste"; and (2) the Policy's clause includes a blanket exclusion for all "[p]ollution/environmental impairment/contamination," and "[a]ll liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any insured or any other person or entity is excluded throughout this policy." (Doc. 39-4 at 4). The "transportation" language included in the "standard" exclusionary clause, generally, is "directed at industrial insureds who must handle, store, and treat 'hazardous wastes' in conducting their daily operations." *Keggi*, 13 P.3d at 790. Although this language is absent from the Policy's clause, the clause still includes ample language comprised of "terms of art in environmental law," that address "events . . . and activities normally associated with traditional environmental pollution claims." (*Id.*). Specifically, the clause speaks directly to the "discharge, dispersal, seepage, migration, release or escape of 'pollutants.'" (Doc. 39-4 at 4). Moreover, the Policy's clause discusses—at length— expenses, penalties, and compliance efforts that result from private litigation, regulatory procedure, or government directive, such as "clean up," "containment," and "test" costs. (*Id.*). The Arizona Court of Appeals has read identical language to "confirm[] that the drafters intended [the pollution exclusionary clause] to apply to "traditional 'environmental pollution' situations and substances." *Keggi*, 13 P.3d at 791. Thus, while the Policy's clause does not specifically mention the "handling," "transportation" or "treatment" of waste or pollutants, its coverage substantially conforms to the "standard" absolute pollution exception that applies to "traditional environmental pollution." *Id.* at 788-89, 791.

1    With respect to the clause's blanket exclusion of coverage for all
2    "[p]ollution/environmental impairment/contamination," (Doc. 39-4 at 4), the Court finds
3    that the presence of this additional language is insufficient to render the entire
4    exclusionary clause "meaningfully distinct" from the "standard" absolute exclusion in
5    *Keggi*. This blanket exclusion turns on the definition of several broad terms—"pollution,"
6    "contaminant," and "impairment." The term "contaminant" is present in the "standard"
7    pollution exclusionary clause. "Pollution"[18] and "impairment" are not, however, and
8    neither term is defined in the Policy. Relying on accepted definitions, the Court finds that
9    these terms—like "irritant" and "contaminant"—are "virtually boundless" "when viewed
10   in isolation," and "cannot be read literally." *Keggi*, 13 P.3d at 789, 791 (citation omitted).
11   Pollution exclusionary clauses developed to address "contaminants" and "irritants" were
12   implemented "in response to . . . concern about pollution claims attributable to
13   environmental catastrophes" and were "intended to eliminate coverage for damages
14   'traditionally associated with environmental pollution.'" *Keggi*, 13 P.3d at 791 (citations
15   omitted). As discussed earlier, the terms "impairment" and "pollution" are exceedingly
16   broad, and must be tethered to some limiting principle to prevent the relatively narrow
17   pollution exclusionary clause from eviscerating coverage. The Arizona Court of Appeals
18   has noted that similar terms must be read in light of the historical purpose and scope of
19   pollution exclusion clauses. Thus, absent clear language in the Policy's clause[19] divorcing
20   it from the clause's historical underpinnings, the terms "pollution" and "impairment"—

---

22   [18] Pollution is defined as "[t]he harmful addition of a substance or thing into an
23   environment; esp., the introduction of man-made products, esp. waste products, into a
24   natural area." BLACK'S LAW DICTIONARY 1347 (10th ed. 2014).

25   [19] Counsel for James River correctly noted at oral argument that the Policy's
     exclusion was an "endorsement" to support the argument that the parties' bargained for
26   an extremely robust exclusion. Counsel continued, arguing that insurance companies
     "write pollution coverage endorsements in all denominations, from 5,000 to a million if
27   you want pollution coverage, you can go out, you can pay for it, and you make it part of
     your bargain." The Court understands the thrust of this argument to support the notion
28   that Quik Flush and James River had "bargained for" an expensive, robust exclusion that
     is meaningfully distinct from the standard absolute pollution exclusionary clause. This
     argument is not sufficiently supported by the record for the Court.

similar to "irritant" and "contaminant"—must be read in light of *Keggi*, to exclude "traditional environmental pollution." The presence of this language, while absolute in nature, nonetheless fails to render the Policy's clause meaningfully distinct from *Keggi*'s.

Having determined that the Policy's pollution exclusionary clause is not meaningfully distinct from the standard absolute pollution exclusion, little remains to suggest that the Policy excludes coverage for Quik Flush's faulty pipe installation. "The history of the pollution exclusion clause is the same," *Saba*, 2014 U.S. Dist. LEXIS 174169, at *10, and—as discussed *supra*—it is noteworthy that the Policy's clause includes no language to sever it from its historical underpinnings. The public policy considerations are the same. The Arizona Court of Appeals rejected a broad reading of the absolute pollution exclusion clause and concluded that public policy supported a narrow interpretation restricting the clause's application to "traditional environmental pollution-related claims." *Keggi*, 13 P.3d at 791, 792. This has not changed in the intervening years. *Saba*, 2014 U.S. Dist. LEXIS 174169, at *10-*11.

Finally, the transaction as a whole supports the Court's conclusion that the Policy's clause does not preclude coverage for Quik Flush's faulty pipe installation. The sewage odor, Hydrogen Sulfide gas, and "backup of four (4) to five (5) feet of waste water into the interior drain of the shopping center," (Doc. 43-5 at 12), were not "pre-existing substance[s]." *Saba*, 2014 U.S. Dist. LEXIS 174169, at *10. The condition was caused by Quik Flush's faulty pipe installation. (Doc. 43-5 at 12-13). The artificial creation of noxious fumes directly caused by standard plumbing installation "takes the case out of any traditional environmental pollution-related claims." *Saba*, 2014 U.S. Dist. LEXIS 174169, at *10 (concluding that negligent "installation of the water heater itself" that created carbon monoxide gas removed the case "out of any 'traditional environmental pollution-related claims'"). Here, Sigma, as general contractor for the shopping center, "entered into a [s]ubcontract [a]greement with Quik Flush . . . to perform plumbing work for the [c]enter." (Doc. 43 at 5). Quik Flush, in turn, obtained "commercial general liability insurance with James River" for its plumbing work.

Construction activities—such as the installation of standard plumbing piping in the shopping center—were contemplated by the Policy. To read the pollution exclusionary clause so as to preclude coverage for non-traditional pollution directly caused by faulty installation of basic plumbing "would seemingly eviscerate coverage," *Saba*, 2014 U.S. Dist. LEXIS 174169, at *10, and would not "protect the reasonable expectations of the insured." *Liberty Ins. Underwriters*, *Inc.*, 158 P.3d at 212 (citation omitted).

After careful consideration, the Court concludes that the Policy's clause operates to exclude coverage for traditional environmental pollution claims, and does not exclude the property damage caused by Hydrogen Sulfide gas created by Quik Flush's faulty pipe installation. Therefore, the Policy provided no clear grounds for James River to refuse to defend Sigma as an additional insured. The duty to defend arises at the earliest stages of litigation and generally exists regardless of whether the insured is ultimately found liable." *INA Ins. Co. v. Valley Forge Ins. Co.*, 722 P.2d 975, 981 (Ariz. Ct. App. 1986). "In Arizona, if any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the insurer will recover (if any) until the action is completed." *Nucor Corp. v. Employers Ins. Co.*, 296 P.3d 74, 83-84 (Ariz. Ct. App. 2012) (citation omitted). Accordingly, the Court concludes that James River breached its duty to defend Sigma as an additional insured. The duty to defend, however, is distinguishable from the duty to indemnify, *INA Ins. Co.*, 722 P.2d at 981, and separate analysis of the duty to indemnify is necessary.

**(C) James River's Duty to Indemnify Sigma**

Progressing in the analysis, the Court turns to James River's contention that it had no duty to indemnify Sigma. "When there is an express indemnity contract," as there is here, "the extent of the duty to indemnify must be determined from the contract . . . and not by reliance on implied indemnity principles." *INA Ins. Co.*, 722 P.2d at 979 (citations omitted). The Policy expressly provides that James River "will pay those sums that the

insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Doc. 39-4 at 4). The "contractual right of indemnity may accrue upon the happening of one or both of two events." *INA Ins. Co.*, 722 P.2d at 980 (citation omitted). There is "[i]ndemnification against liability" which is triggered "once liability for a cause of action is established" and the "indemnitee is not required to make actual payment." *Id.* (citation omitted). There is also "indemnification against loss or damages," which "applies when the indemnitee has actually paid the obligation for which he was found liable." *Id.* (citation omitted). "Indemnification against a loss [or damages] encompasses a loss incurred through a settlement as long as the loss is covered by the indemnity agreement." *MT Builders, L.L.C. v. Fisher Roofing, Inc.*, 197 P.3d 758, 673 (Ariz. Ct. App. 2008) (citation omitted).

The Policy explicitly mentions indemnity for damages that the insured incurs, and makes no mention of "liability [the insured] may become obligated to pay for damages," establishing that the contractual right to indemnity under the Policy is triggered when the insured "has actually paid the obligation for which [it] was found liable." *INA Ins. Co.*, 722 P.2d at 980 (citation omitted). "The accrual of the right to indemnify is important here . . . to illuminate a basic principle of indemnity," that "[t]he right exists when there is a legal obligation on the indemnitee to pay or a sum is paid by him for which the indemnitor should make reimbursement." *Id.* Sigma became obligated to pay $242,500 on or about September 21, 2012,[20] when settlement ended the *Knuth* lawsuit.

Plaintiffs have advanced a litany of arguments to resist summary judgment, but chiefly argue that the Superior Court's order granting summary judgment in *Knuth* only adjudicated "some" of EJ's "claims and damages" and did "not entirely eviscerate

---

[20] The Superior Court's docket lists a "Notice of Settlement" as having been received on September 21, 2012. The record does not include a copy of the settlement itself, and neither party includes the date of settlement in its respective statement of facts. Plaintiffs note that "[o]n February 13, 2012, National Fire participated in mediation and agreed to pay $242,500 as its contribution to a global settlement of the [*Knuth* tenants'] lawsuit." (Doc. 39 at 8).

them."[21] (Doc. 40 at 8). In the Superior Court's August 3, 2012, order, it concluded that EJ's had previously entered into an agreement that waived both its claims and its damages against Sigma. (Doc. 39-4 at 18). But the court then proceeded to analyze Sigma's claim that EJ's "damages [were] speculative, duplicative, improper, and/or not supported by admissible evidence." (*Id.* at 21-22). Understandably, this caused some confusion, and led EJ's to file a motion for clarification of the court's August 3, 2012, order. (*Id.* at 25). In the court's August 24, 2012, order, it "reaffirm[ed] that the [c]ourt's August 3, 2012 Order granted Defendants' Motion for Summary Judgment in its entirety (including Defendants' argument that EJ's . . . damages occurred prior to February 19, 2009)." (*Id.* at 26). Read together, the court's orders establish that the motion for summary judgment was granted against all of EJ's claims, as the court addressed the argument that "all of EJ's claimed damages . . . were incurred prior to February 19, 2009," (*id.* at 26), and that these claims and damages were waived by an agreement EJ's had entered into. (*Id.* at 18). Plaintiffs have failed to cite any evidence to establish that EJ's had claims remaining in the *Knuth* suit at the time of settlement, or that any portion of the settlement was distributed to EJ's.

Plaintiffs further argue that EJ's was still a party in *Knuth* because "the order was appealable and EJ's may have been contemplating a motion for reconsideration." (Doc. 40 at 8). To address Plaintiffs' "appealable order" argument, the Court notes that the Superior Court entered summary judgment against EJ's on August 3, 2012. (Doc. 39-4 at 18). The Arizona Court of Appeals requires that an appeal be filed within "30 days after entry of the judgment." Ariz. R. Civ. App. P.R. 9(a). EJ's was required to file its appeal by September 8, 2012, Ariz. R. Civ. P. 6(a),(e), and the Superior Court's docket contains no entry for a notice of appeal. Both the mediation session regarding settlement on September 13, 2012, and the Superior Court's receipt of the parties' Notice of Settlement

---

[21] A subset of this argument is Plaintiffs' contention that because "at this late date, there is no way to determine what portion of Sigma's payment went to EJ[']s," Plaintiffs are entitled to indemnity or subrogation. (Doc. 40 at 8). This argument is not supported by the record.

1    on September 21, 2012, occurred after EJ's window to appeal the Superior Court's order

2    expired. And, succinctly, the Court is not persuaded by Plaintiffs' stand-alone argument

3    that the unexercised possibility that EJ's might file a motion for reconsideration somehow

4    amounts to survival of a dispositive motion that adjudicates all of a party's claims.

5         Finally, Plaintiffs' argue that—even assuming that EJ's claims were dismissed

6    from the *Knuth* tenants' lawsuit prior to settlement—*Home   Indem. Co. v. Mead*

7    *Reinsurance Corp*., 800 P.2d 46, 48-49 (Ariz. Ct. App. 199), compels indemnity because

8    "the duty to indemnify must follow the duty to defend [as] there are no factual findings to

9    consider in determining which insurers are obligated to indemnify the insured." (Doc. 42

10   at 10). "When the underlying litigation is settled prior to trial, 'the duty to indemnify

11   must be determined in the basis of the settlement.'" *Nucor Corp.*, 296 P.3d at 77 (quoting

12   *Travelers Ins. Co. v. Carl Brazell Builders*, *Inc.*, 883 F.2d 1092, 1099 (1st Cir. 1989)).

13   *Home Indem. Co.* involved "the theories of liability under which the claimants in the

14   underlying cases would have prevailed" and the insurance company's position that the

15   policy excluded all but one theory of recovery. 800 P.2d at 48. When the case settled, it

16   was impossible for the court to determine under which theories of liability the insurance

17   company would have to indemnify the insured. *Id.* at 49. Thus, while the court noted that

18   the "the duty to indemnify must follow the duty to defend," *id.* (citation omitted), the

19   duty to indemnify was still "determined in the basis of the settlement." *Nucor Corp*., 296

20   P.3d at 77 (citation omitted). That is not the case here. In the matter at hand, EJ's claims

21   and damages were dismissed on August 3, 2012. "[T]he duty to defend carries with it the

22   contractual obligation to indemnify until it becomes clear that there can be no recovery

23   within the insuring clause." *Home Indem. Co.*, 800 P.2d at 49 (citation omitted). The

24   *Knuth* tenants settled six weeks later. The duty to indemnify, "determined in the basis of

25   the settlement," *Nucor Corp*., 296 P.3d at 77 (citation omitted), does not attach to James

26   River.

27        Based on the foregoing analysis, the Court finds that all of EJ's claims as a

28   plaintiff in *Knuth* were disposed of by the Superior Court's August 3, 2012, order, and

that EJ's was not a party to the lawsuit on September 21, 2012, the date when James River's legal obligation to indemnify Sigma as an additional insured arose. *INA Ins. Co.* 722 P.2d at 980 (citation omitted). The Court further finds that the record contains no evidence that EJ's received settlement funds or that the remaining *Knuth* tenants could trace their respective claims to an "occurrence" when the Policy was in effect. Per these findings, having made "all justifiable inferences" in Plaintiffs' favor,[22] *Hopper v. City of Pasco*, 241 F.3d 1067, 1087 (9th Cir. 2001) (citation omitted), the Court concludes that James River had no duty to indemnify Sigma as an additional insured and Plaintiffs are not entitled to subrogation. It follows that Plaintiffs' motion for summary judgment on the issue of indemnity is denied, and James River's motion for summary judgment on the issue of indemnity is granted.

**(D) Plaintiffs' Claim for Equitable Contribution**

As set forth *supra*, the Court has concluded that: (1) James River had a duty to defend Sigma as an additional insured against entirety of the *Knuth* lawsuit; (2) James River breached its duty to defend Sigma; (3) James River had no duty to indemnify Sigma and therefore Plaintiffs are not entitled to subrogation. The Court now turns to the final issue raised by the parties' motions: Plaintiffs' contention that National Fire is entitled to equitable contribution from James River. (Doc. 42 at 13-14).

The Arizona Supreme Court has expressly recognized that "[u]nder the principle of equitable [contribution], the insurer which has performed the duty to provide a defense to its insured should be able to compel contribution for a share of the cost of defense from another insurer who had a similar obligation to the same insured but failed to

---

[22] On this issue, Sigma is resisting James River's argument raised in its motion for summary judgment that EJ's had been dismissed from the suit and thus it had no duty to indemnify Sigma for the settlement. As the non-movant on this issue, the Court must make all "justifiable inferences" in Plaintiffs' favor.

perform it."[23] *Nat'l Indem. Co. v. St. Paul Ins. Co.*, 724 P.2d 544, 545 (Ariz. 1986). To determine whether equitable contribution is appropriate, Arizona courts apply a four-part test. *Nucor Corp.*, 296 P.3d at 83. The respective insurers "must cover '(1) the same parties, (2) in the same interest, (3) in the same property, and (4) against the same casualty.'" *Id.* at 83-84 (citation omitted); *see also* 15 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 218:3 (3d ed. 2011). These are the only "conditions on the right to seek equitable contribution." *Nucor Corp.*, 296 P.3d at 84. "So long as 'one insurer pays a loss or defends a claim for which another insurer shares responsibility,' equitable contribution is permitted." *Id.* (quoting *Md. Cas. Co. v. Nationwide Ins. Co.*, 76 Cal. Rptr. 2d 296, 303 (Cal. Ct. App. 1998)).

Here, both James River and National Fire were "primary insurers" of Sigma. The subcontract agreement between Sigma and Quik Flush required Quik Flush to obtain a CGL policy that named Sigma as an additional insured with coverage on a primary, non-contributory basis. (Doc. 43-3 at 48). National Fire's policy specifically lists Sigma as the primary insured. (Doc. 43-1 at 2). Additionally, the policies each covered construction work on the shopping center. James River's Certificate of Liability Insurance specifically referenced the "[o]perations of Named Insured" as to what activities it insured. Finally, and importantly, both the Policy and National Fire's policy covering Sigma protected against "property damage" that was caused by an "occurrence." (Doc. 43-1 at 12; Doc. 43-2 at 7); *see Regal Homes, Inc. v. CAN Ins.*, 171 P.3d 610, 620 (Ariz. Ct. App. 2007) (concluding that a party was eligible for equitable contribution when all of the insurance

---

[23] The Court notes that while the Arizona Supreme Court approved of the doctrine of "equitable subrogation" in *Nat'l Indem. Co.*, the court was actually approving the ability of one insurer to seek "contribution for a share of the cost of defense from another insurer." 724 P.2d at 545. Arizona courts have subsequently characterized this theory of recovery as "equitable contribution." *Nucor Corp.*, 296 P.3d at 83-84 (citing *Nat'l Indem. Co.*, 724 P.2d at 544-45); *cf. Hartford Accident & Indem. Co. v. Aetna Cas. & Sur. Co.*, 792 P.2d 749, 752-53 (Ariz. 1990) (describing equitable subrogation as "whereby the excess insurer steps into the shoes of the insured" and a doctrine designed to "encourage fair and reasonable settlements of lawsuits").

policies at issue "were 'occurrence' policies"). James River argues that the two policies are "very different" because the Policy contains the more robust absolute pollution exclusion. (Doc. 47 at 7-8). The Court is not persuaded by the unsupported argument that the presence of an exclusionary clause addressing a small range of events coupled with National Fire's failure to assert a similar exclusionary clause renders the two insurance policies "very different." Both are CGL policies that afford primary coverage to the insured(s) for property damage that is caused by an occurrence. The Court finds that the two insurance policies cover the "same parties . . . in the same interest . . . in the same property . . . against the same casualty." *Nucor Corp.*, 296 P.3d at 84. Having satisfied the four-part test, National Fire is eligible for equitable contribution.

"[I]f any claim alleged in the complaint is within the policy's coverage, the insurer has a duty to defend the entire suit, because it is impossible to determine the basis upon which the plaintiff will recover (if any) until the action is completed." *Regal Homes*, *Inc.*, 171 P.3d at 619 (quoting *Western Casualty & Surety Company v. International Spas of Arizona*, *Inc.*, 634 P.2d 3, 6 (Ariz. Ct. App. 1981)). James River had a duty to defend Sigma from EJ's claimed property damage. *See id.* at 620 (noting that a duty to defend existed even though the defendant insurance company provided coverage for only one year when claims were filed across three years). By operation of law, James River's duty to defend Sigma extended to all of the *Knuth* tenant claims and James River refused to defend Sigma in error.

Nonetheless, at this stage of the proceedings, "a question of fact exists as to whether and to what extent [National Fire's] defense costs would have been decreased" if James River had contributed to Sigma's defense. *Regal Homes*, *Inc.*, 171 P.3d at 620. Summary judgment is not appropriate, as further evidence is necessary to determine whether Plaintiffs can show that contribution from James River is warranted. It follows that Plaintiffs' motion for summary judgment on the issue of equitable contribution is denied.

**IV.**

In sum, the Court concludes the following: (1) James River had a duty to defend Sigma and breached that duty; (2) James River had no duty to indemnify Sigma for property damage caused by Quik Flush's plumbing installation as none of the property damage addressed by the *Knuth* tenants' settlement could be traced to an "occurrence" during the Policy; and (3) further factual development is necessary to determine whether National Fire entitled to equitable contribution for the defense of Sigma against the *Knuth* tenants' lawsuit.

For the aforementioned reasons,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment, (Doc. 42), with respect to the issue of James River's duty to defend Sigma as an additional insured is **GRANTED**, and James River's motion for summary judgment, (Doc. 38), on the issue is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgment, (Doc. 42), with respect to the issue of James River's duty to indemnify Sigma as an additional insured is **DENIED**, and James River's motion for summary judgment, (Doc. 38), on the issue is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for summary judgement, (Doc. 42), with respect to the issue of equitable contribution is **DENIED**.

Dated this 16th day of February, 2016.

James A. Teilborg
Senior United States District Judge